IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| JANE DOE | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 1:25-cv-2299 |
| | ) |
| TEXAS CHRISTIAN UNIVERSITY | ) |
|     Serve: Registered Agent: | ) |
|         Daniel W. Pullin | ) |
|         3101 Bellaire Drive North | ) |
|         Suite 3200 | ) |
|         Fort Worth, TX 76129 | ) |
| | ) |
| Defendant, | ) |
| | ) |

## COMPLAINT

Plaintiff Jane Doe ("Jane")[1] states the following claims against Texas Christian University ("TCU").

**Nature of the Case**

1. Jane brings this case for violation of the Virginia Consumer Protection Act, Va. Code § 59.1-200, *et seq*., fraudulent inducement and fraud, intentional infliction of emotional distress, and breach of contract. TCU recruited Jane in Virginia and contracted with her in Virginia through intentionally misleading representations made to her in Virginia which led to her serious injury.

---

[1] Jane Doe is a pseudonym, as explained in the accompanying Motion for Leave to Proceed Pseudonymously.

1

#10356782v5

## Jurisdiction and Venue

2. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1332 and 1367(a). Jane is a citizen and resident of the Commonwealth of Virginia; TCU is a citizen of Texas with its principal place of business in Texas; and the controversy exceeds $75,000 in value, exclusive of interest and costs.

3. This Court has personal jurisdiction over TCU under the Virginia Long-Arm Statute, Va. Code§ 8.01-328. 1(A) (2), and venue is permitted in this Court under 28 U.S.C. § 1391(b)(l) and (2), because the events or omissions giving rise to the claim occurred in this judicial district.

## Background Facts

4. TCU recruits heavily in Virginia every year. It sends representatives to Virginia every year to assist in this recruiting.

5. The recruitment of Virginia high school students is so important to TCU that they have a designated representative who is specifically tasked with recruiting students from the Commonwealth.

6. Because Jane's high school in northern Virginia is well known to produce excellent students, TCU specifically recruits students from that school every year.

7. Jane was an excellent student in high school.

8. When Jane was a junior and then a senior in high school, TCU specifically recruited Jane to attend TCU.

9. In those years, TCU sent Jane's high school promotional materials intended for students, and Jane reviewed that material.

#10356782v5

10. When Jane expressed interest in TCU, the university sent her promotional material directly, both by mail and by email to Virginia, and TCU directed her in Virginia to visit its website for more information.

11. Jane has family members who were sexually assaulted and discriminated against, so in looking at colleges she paid particular attention to the issue of safety and protections for women.

12. All of the material directed by TCU to Jane in Virginia intentionally and materially misrepresented aspects of the university that were critical to Jane's decision on where to attend college—the safety of the school's environment for women and the school's commitment to protecting women from sex discrimination.

13. All of the material intended to induce Jane's acceptance of TCU's offer to apply for admission included multiple references to TCU's being a safe and supportive environment for women and to TCU's commitment to providing an environment free from sex discrimination.

14. Knowing that 60% of its students are women, TCU's website and promotional materials read like an advertisement for women concerned about safety and non-discrimination. Among many references, TCU assured Jane and other students and their parents in Virginia that the university "works to provide a safe and supportive environment for students," that the school's Office of Institutional Equity ("OIE") works to support the university's goals "by ensuring all individuals have the opportunity to meaningfully engage in a learning and working environment that is free from all forms of harassment and discrimination," and that the university is "committed to providing a[n]… environment free from discrimination …."

15. TCU intended for prospective students in Virginia and their parents to rely on these representations, and Jane did reasonably rely on them.

16. As a direct result of these misrepresentations, Jane applied for admission to TCU.

17. TCU communicated to Jane by mail in Virginia an offer to admit her to the university. It further enticed Jane by sending her an offer in Virginia of a four-year scholarship for approximately $40,000.

18. It was as a direct result of the false representations made to her in Virginia, enhanced by the scholarship offer, that Jane chose to attend TCU and her parents committed to spend hundreds of thousands of dollars to send her there. Without those false statements, Jane would not have foregone the excellent universities in Virginia to attend TCU.

19. At the time TCU made the statements to Jane in Virginia about the school's "safe and supportive environment," and its "environment free from discrimination," and continuing to the day TCU consummated its transaction with Jane by providing her a room on campus, TCU knew for a fact:

    a. Rape and other sexual assault were rampant on the TCU campus and had been for years.

    b. There are dozens of reported, and many more unreported, sexual assaults/rapes on its campus every semester.

    c. College men rape their fellow students because they think they can get away with it.

    d. TCU considers rape to be a "mistake" for which homework can be an appropriate "remedy."

#10356782v5

e. TCU maintains a demonstrable "Squeaky Wheel" investigatory policy that could fairly be characterized as "Delay, Pretend, Retaliate, Humiliate and Drop."

f. By design, TCU fails to investigate 97% of sexual assault allegations.

g. To protect its female students, TCU would have to demonstrate to its male students that they cannot get away with rape because TCU will impose a significant negative consequence, i.e., punishment, for a male student found to have raped a female.

h. TCU actively discourages students from filing or pursuing complaints about sexual assault/rape.

i. Even if a student files a complaint, does not drop it when discouraged by TCU's OIE, and proves rape, TCU will almost certainly not impose any punishment that would in any way discourage male students from continuing to rape females on campus.

j. TCU applies radically different treatment to its male and female students.

k. Recognizing that female rape victims want to avoid drawing attention to their highly private injury, and therefore can be counted on not to attract publicity, TCU treats them as being responsible for their own rape. In this way, the school successfully discourages rape victims from making waves.

l. Because male rapists and their families are more likely to raise a stink if the rapist is suspended or expelled for raping a fellow student, TCU treats the male rapists as having made a "mistake" and simply being in need of some educational therapy.

#10356782v5

    m. Rather than protect female students from being raped, TCU's policy was and is to protect male students who rape. The policy is designed to create the illusion for female students of protecting them, while not offending the male students who rape or the parents who pay more than $82,000 per year for their sons to attend TCU.

    n. TCU's de facto policy is, "Boys will be boys, and we can't let a moment of poor judgment that results in rape ruin a boy's life, regardless of how it affects the girl's."

    o. TCU's treatment of rapists encourages sexual assault/rape.

Therefore, at all relevant times, TCU knew the school environment was neither safe nor supportive for women nor remotely free from discrimination.

### Jane's Pseudonym

20. Courts have discretion to allow proceeding anonymously where privacy or confidentiality concerns are at stake. *James v. Jacobson,* 6 F.3d 233, 238 (4th Cir. 1993). All five factors that the Fourth Circuit articulated as relevant to this analysis favor anonymity. *Id.*

21. This litigation involves matters that are highly sensitive and of a personal nature, and identification of Plaintiff would pose a risk of retaliatory physical harm to her.

22. Plaintiffs experience has been deeply psychologically traumatic, and public knowledge of such abuse is likely to trigger new trauma even years after the fact.

23. In addition, Plaintiff is in college and about to embark on her career.

24. The action involves private parties, and there is no unfairness to the other party.

25. Plaintiff would face a very real risk of harassment, ridicule, and personal embarrassment were she to proceed under her name.

#10356782v5

**Jane's Rape**

26. In October 2024, a male TCU student (the "Rapist") raped Jane on the TCU campus when he knew she was unconscious and not capable of consenting.

27. Immediately after the rape, Jane called, by FaceTime, her two best friends to tell them what had just happened. She then immediately called TCU's sexual assault hotline.

28. In a conversation recorded only hours after the rape, the Rapist admitted that he neither sought nor received Jane's consent to do what he did to her.

29. Too traumatized to attend class, Jane called her mother, told her what happened, and left school several days early to go home to Virginia for TCU's fall break.

30. While in Virginia, because the rape had been unprotected sex, Jane went to a physician to be tested for sexually transmitted disease and for pregnancy. She also started seeing a therapist to deal with the trauma she had experienced and was still experiencing.

**Jane's Formal Report of the Rape and the Eventual Hearing**

31. On October 15, 2024, when Jane returned to TCU after fall break, she filed a formal complaint with TCU's OIE. Shortly thereafter she met with TCU's investigator, **Angelica Ramirez**, for an in-person interview where she described the rape in detail.

32. The evidence confirming the rape was overwhelming. Jane had immediately reported the rape to witnesses and to the sexual assault hotline. The witnesses said she was sobbing and shaking as she recounted the rape. Most damning of all, the Rapist had admitted in a recorded conversation the same day as the rape that he had neither sought nor obtained her consent.

33. TCU delayed any investigation of Jane's complaint and actively discouraged Jane from pursuing it. Although there were only a few witnesses for TCU's investigator to

interview, and each interview would take only a few minutes, the investigator showed no interest in pursuing the matter. Ignoring and violating its own written rules to "promptly investigate" complaints of sexual assault, TCU did nothing to investigate, hoping that Jane would decide not to pursue her complaint.

34. Wanting to impede Jane's prosecution of her complaint, and knowing that witnesses' memories fade quickly, especially for events they were not personally involved in, TCU intentionally avoided contacting those witnesses. When more than a month had passed without the investigator contacting Jane or Jane's witnesses, Jane engaged outside counsel.

35. On November 22, 2024, a full five weeks after Jane had filed her complaint, Jane's counsel wrote to the investigator, **Angelica Ramirez;** TCU's then-chancellor, **Victor J. Boschini, Jr.;** its then-president (now chancellor), **Daniel W. Pullin;** its general counsel, **Lee Tyner;** its supposed Title IX coordinator, **N. Friesema** (falsely listed as such on TCU's website although no person was actually in that role); and its director of OIE, **Sharon Gooding;** and demanded action. TCU's response was to pretend to investigate Jane's case.

36. Only after receiving that letter and a phone call from Jane's counsel did TCU contact Jane's witnesses, some six weeks after Jane had filed her complaint. TCU emphasized to the witnesses that they did not have to cooperate.

37. In retaliation for Jane's counsel's complaining about TCU's cavalier approach to her complaint, Ramirez then called Jane in for a second in-person interview, this time by both Ramirez and Gooding. Ramirez and Gooding intentionally humiliated Jane by forcing her to recount and relive the rape once again and then suggesting that maybe the rape was her

#10356782v5

fault. In this second interview, Ramirez and Gooding reverted to a 1950's treatment of a rape victim: Was she wearing a suggestive outfit? How thin were her shoulder straps? How short was her skirt? Was she wearing underwear? How much had she had to eat that day? And, repeating the same questions asked in the first interview, exactly how much had she had to drink? TCU acted as if the real problem here was not that the Rapist knowingly penetrated Jane without her consent while she was not conscious, but that Jane's manner of dressing and acting meant that she must have wanted him to do it and given tacit consent.

38. TCU tried to bully Jane into dropping her complaint by insisting on having the hearing on her case on a date when TCU knew her counsel would be unavailable. Only when threatened with legal action for the illegality of such a move did TCU relent and schedule the hearing when Jane could be represented by counsel.

39. On February 20, 2025, TCU held an all-day hearing on Jane's complaint. Associate Dean of Students **David Cooper** and Assistant Dean of Students **Jeremy Steidl** served as "Procedural Chair" for the hearing. Justice **R. Malcolm Graham,** Ret., served as "Panel Chair." Three TCU employees chosen by **TCU—Annie Cowden,** Director - BNSF Neeley Leadership; Dr. **Christine Hall-** Assistant Professor of Professional Practice; and Dr. **Jay Iorizzo,** Director - Campus Recreation—served as panel judges. During the hearing, Jane was repeatedly required to relive the rape in front of many strangers and subjected to cross-examination by five different questioners.

### The Verdict, the "Remedy" and the Appeal

40. In a written report issued February 25, 2025, five days after the all-day hearing, the TCU hearing panel formally and unanimously found that the Rapist had had sexual intercourse

#10356782v5

with Jane without her consent. This finding constitutes rape and was always inevitable due to the overwhelming evidence of guilt.

41. Incredibly, after the panel unanimously found him guilty of rape, TCU refused to punish the Rapist. He was not required to miss a single day of school, to make any kind of reparation, or even to apologize. And TCU made sure that nothing about his offense of non-consensual sexual intercourse, i.e., rape, will ever appear on any record of his time at TCU.

42. Instead, TCU gave the Rapist homework—write a 3-4 page paper on the importance of mutual consent and discuss it, in private, with a TCU faculty member. And rewatch the short videos on consent he had been required to watch in orientation just six weeks before raping Jane.

43. Jane appealed the "remedy" imposed by TCU because it was grossly disproportionate to the offense. **(Exhibit A,** redacted to preserve anonymity.)

44. TCU waited more than a month before **Michael Russel,** Vice-Chancellor of Student Affairs, denied the appeal. His written decision perfectly explains why there are so many rapes at TCU.  When a female student is raped, courageously goes through TCU's grueling procedures requiring her to be humiliated by the investigator and to relive the rape over and over again in front of strangers, and succeeds in proving the rape, there will be no real punishment because TCU regards the entire process as "educational" for the rapist since, after all, rape is just a "mistake."

> The hearing panel is responsible for determining whether a policy was violated and designing a response that ensures the respondent learns from their **mistakes**. … [T]he remedies were sufficient to achieve the **educational goals of the process.**

**(Exhibit B,** redacted to preserve anonymity, emphasis added.)

45. Under TCU's written procedures, as confirmed by TCU's Assistant Dean Jeremy Steidl, there is no avenue of further appeal within TCU.

**The Aftermath**

46. Two weeks after the panel's announcement of its finding that the Rapist indeed raped Jane, a TCU student whom Jane had never met, accosted Jane in a public place on TCU's campus and screamed at her in front of numerous other students that she was a "fucking bitch" and a "whore" because of the accusations she had made against his "best friend" (i.e., the Rapist).

47. Like the Catholic Church quietly moving a rapist priest from the parish where he raped and is known to another where he is unknown and can continue to rape, TCU transferred the man who had admitted his rape more than six months earlier and was found guilty of rape, to another dormitory. TCU waited until just days before the end of the spring semester to do so.

48. As a proximate and foreseeable result of TCU's misrepresentations to Jane as described above, Jane suffered and continues to suffer severe personal injury. Knowing that the Rapist was still at TCU and had received no serious punishment for raping her, Jane was psychologically unable to return to TCU after the spring semester of her freshman year. She gave up her scholarship and left the school in order to mitigate the damage she continued to suffer from the school's wrongful conduct.

49. On June 25, 2025, Jane's counsel sent TCU a draft complaint laying out the facts of the school's wrongdoing. In response, TCU sent to Jane in Virginia a letter dated July 10, 2025, admitting the university's decision on appeal was wrong and saying that it had

reversed its decision and was now (mid-summer) suspending the Rapist for two semesters.

50. For several reasons, Jane alleges that this supposed reversal was a sham. First, nothing in TCU's rules governing the complaint process allows such a no-notice, post-appeal suspension. As stated by Assistant Dean Jeremy Steidl in his April 16, 2025, letter forwarding the denial of Jane's appeal, "In accordance with the TCU Code of Student Conduct, **this is the final determination in this matter** and is binding on all involved parties at this time." (Emphasis added.)

51. Second, taking this action in violation of the rules communicated to the parties and without notice or an opportunity to be heard would be an obvious violation of the Due Process Clause of the Constitution of the United States and therefore unenforceable.

52. Third, upon information and belief, the Rapist had already transferred to another school so the suspension, even if "carried out" by the university, would have zero impact on him.

53. In addition to the false representations made to Jane in Virginia to induce her to attend TCU and the false representations of the July 10 letter sent to Jane in Virginia, TCU made misrepresentations to Jane and her family in Virginia to induce them to put off filing the lawsuit and instead to participate in very expensive pretrial mediation in Virginia. TCU negotiated with Jane in Virginia regarding the mediation and promised to fly representatives to Virginia for the in-person mediation process. TCU entered into an agreement with Jane to use a mediator chosen by TCU, former United States District Court Judge Liam O'Grady, to attend the mediation in person in Alexandria, Virginia on August 11, 2025, and to pay half the cost of the mediation.

54. TCU also entered into an agreement with Judge O'Grady in Virginia regarding the mediation that it promised to attend in Virginia.

55. Jane incurred substantial legal fees to prepare for the mediation. On the agreed date of the mediation, Judge O'Grady and Jane's representatives showed up as promised at the agreed location in Alexandria. TCU failed to show for the mediation, thereby breaching its agreement with Jane to mediate in Virginia.

56. In communicating to Jane in Virginia its last-minute refusal to mediate, TCU stated, "these claims are really not worth much in court" and "this case will never stay in Virginia."

57. This "bait and switch," or rather "bait and ditch," by TCU is a continuation of its severe intentional harm of Jane.

58. TCU knew that preparing for an all-day mediation with her adversary where she would be required to relive the rape once again before strangers would exact a heavy emotional toll from Jane. And it knew that the last-minute additional betrayal by her university by failing to show for the mediation would cause further harm to Jane.

**Pattern and Practice of Discrimination**

59. Upon information and belief, TCU has for years followed, and continues to follow, this policy of not punishing rapists and, in effect, punishing rape victims instead. This policy and TCU's actions in this case constitute a pattern and practice of sexual discrimination and an intentional indifference to the safety and wellbeing of Jane and other students, a danger which TCU knows disproportionately affects female students, in direct contradiction of its representations quoted above.

#10356782v5

60. TCU's Board of Trustees' reports, made available on its website, show that the university recorded 564 official reports of sexual assault-rape between August 15, 2020, and December 31, 2024. The records demonstrate that TCU launched formal investigations in less than 5 percent of those 564 cases. And it is well known by TCU that most instances of sexual assault/rape are not even reported.

61. During the Fall Semester of 2024 at TCU, there were 64 reports of sexual assault/rape. According to TCU's own data, only three of these cases were formally investigated by TCU, and none resulted in disciplinary action.

62. No reasonable person would think that the non-punishment doled out to the Rapist by TCU was an appropriate consequence for a male student who was found to have raped a fellow female student, nor would any reasonable person think that such a "punishment" would do anything whatsoever to deter would-be rapists.

63. Instead, TCU's policy makes TCU's procedures dealing with sexual assault, from complaint through hearing and appeal, entirely illusory. A rape victim is encouraged on TCU's website to rely on the university's procedures for reporting sexual assault, not knowing what TCU knows—that TCU will intentionally discourage and humiliate the complainant and that, even if the rapist is found guilty, there will be no real consequence, so the entire process (including all of the pain, anguish, anxiety, humiliation and trauma of having to relive the rape through countless retellings to strangers) is utterly pointless.

64. TCU knows, as any reasonable person would know, that this policy of non-punishment actually *encourages* rape because male students at TCU know that nothing will happen to them for raping TCU's female students. Based on the Rapist's case and many others like it, men at TCU who want to have sex with a non-consenting TCU female will say to

themselves, "I'll pretend she consented. It will be my word against hers. She might decide she's OK with it. Or she might not file or pursue a complaint because TCU will discourage it. But, even if she complains, and even if I'm found guilty, ***nothing will happen to me.***"

65. Rather than disclose these facts to Jane when recruiting her in Virginia, TCU not only concealed them but represented the opposite—that the university provides a "safe and supportive environment" for women "free of discrimination."

**COUNT I – VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT**

66. Plaintiff repleads the allegations of the foregoing paragraphs.

67. Before Jane accepted her scholarship and began her freshman year at TCU, TCU had actual knowledge from both oral reports and written complaints from students that sexual assault, including nonconsensual sexual intercourse (rape), of its female students was a severe and pervasive problem on campus.

68. And TCU also knew that the way it handled complaints of rape—regarding rape as just a "mistake," failing to investigate complaints of rape, discouraging complainants from pursuing their claims of rape, and imposing no real punishment on rapists—greatly exacerbated the danger for women.

69. TCU's representations in its promotional material and its website that TCU offers a "safe and supportive environment" for women, an environment "free of discrimination," and in compliance with the law was false, and shown to be so by its cavalier treatment of Jane after her rape.

70. TCU is a supplier of consumer goods and services as defined in the Virginia Consumer Protection Act, Va. Code § 59.1-196, *et seq*. Soliciting and signing up students in

Virginia to come to TCU and pay for its goods and services constitutes a "consumer transaction" under that statute.

71. The Virginia Consumer Protection Act, Va. Code § 59.1-200 (A), prohibits:

> 5. Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;
> 6. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model;
> …
> 14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

72. TCU's written communications to Jane through promotional materials and its website incorporated in those materials knowingly misrepresented the characteristics, benefits and quality of those goods and services, and used deception to induce Jane to enter into the contract to pay for and receive those goods and services.

73. TCU's knowing and intentional violation of the Virginia Consumer Protection Act proximately caused personal injury and economic harm to Jane, as explained in more detail below.

## COUNT II—FRAUDULENT INDUCEMENT AND FRAUD

74. Plaintiff repleads the allegations of the foregoing paragraphs.

75. At all relevant times, TCU knew that its representations regarding its "safe and supportive environment" for women "free from discrimination" and its compliance with the law were false, but it used these representations to Jane in Virginia and its offer of scholarship to Jane in Virginia to induce Jane to leave Virginia and attend the university.

76. Having fraudulently induced Jane to attend the school, TCU continued the fraud through its handling of Jane's complaint of rape. Indeed, upon information and belief, that fraud

continues today as TCU has done nothing to change its treatment of rape on campus from that which Jane experienced.

77. Jane discovered the fraud through her experience with the hearing and its outcome.

78. As a proximate result of TCU's fraud, Jane suffered severe personal injury as well as economic harm, as explained further below.

## COUNT III—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

79. Plaintiff repleads the allegations of the foregoing paragraphs.

80. TCU knew to a moral certainty that its years-long policies of misrepresentation and deliberate indifference to nonconsensual sexual intercourse (rape) of its female students and its cavalier treatment of female students who complain of being raped, would result in more TCU women being raped. It was not a question of *whether* TCU's policies would result in more rapes, but only *who* would be the unfortunate female students to suffer the consequences of those policies.

81. TCU knew that its luring women to attend with false statements about TCU's "safe and supportive environment" for women "free from discrimination," coupled with decades of deliberate indifference to women and rape, would inflict severe emotional distress on the female students who suffered rape as a result of such misrepresentations and indifference. This means TCU intended to inflict such harm. *Reed Tool Co. v. Copelin,* 689 S.W.2d 404, 406 (Tex. 1985).

82. By imposing no real punishment on the student found unanimously to have raped her, TCU sent a loud, unmistakable message to Jane: "It does not matter that you were raped."

83. As Jane stated in her fruitless appeal (**Exhibit A**) of the ludicrous remedy, "Can you imagine how worthless the panel's judgment made me feel?"

#10356782v5

84. TCU knew that having already suffered rape and been required to relive it over and over again through TCU's complaint process, Jane was emotionally fragile when TCU issued its ruling. And TCU knew that not to punish the man found to have raped Jane would severely traumatize and damage her, hitting her like a second rape.

85. TCU's conduct regarding the mediation demonstrates an inconceivable lack of humanity and is just one more example of its willingness to make false representations in Virginia.   Additionally, TCU's dishonest tactics left Jane and her parents responsible for bearing the cost of a very expensive mediation that TCU had intentionally made worthless.

86. TCU's misrepresentations and deliberate indifference caused Jane to suffer severe anxiety, a pervasive sense of fear and lack of control, depression, inability to concentrate, severely disturbed sleep (including insomnia and nightmares), humiliation, shame, mood swings, post-traumatic stress disorder, and a distrust of others, especially men, that make it harder to have a normal, loving relationship with others.

87. While some of these conditions may improve with time, the emotional harm from rape does not go away. Jane will carry it for the rest of her life.

88. TCU's actions in encouraging the rape of its female students were willful and wanton and in reckless disregard of the rights of those females, including Jane. TCU adopted and followed its rape-encouraging policy because it values male students more than female students, and because not offending the rapists and their families serves to increase TCU's revenues. These revenues allow TCU to continue to pay its men's football and basketball coaches more than $10 million per year, and to pay millions of dollars to TCU's executives to continue to cover up the university's blatantly wrongful conduct.

#10356782v5

## COUNT IV – BREACH OF CONTRACT

89. Plaintiff repleads the allegations of the foregoing paragraphs.

90. TCU entered into a contract with Jane in Virginia to engage in mediation in person in Virginia before the Honorable Liam O'Grady, Judge (Ret.).

91. In reliance on that contract, Jane incurred substantial legal expenses, travel expenses and the cost of the mediator in Virginia.

92. TCU willfully breached that contract and thereby proximately caused damage to Jane in Virginia.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment in favor of Jane Doe against TCU as follows:

a. As to Counts I, II, and III, compensatory damages in the amount of $50,000,000;

b. As to Count I, treble damages, for a total of $150,000,000 for willful violation of the Virginia Consumer Protection Act;

c. As to Counts II and III, punitive damages in the amount of $50,000,000;

d. As to Count IV, compensatory damages equal to all expenses incurred as a result of TCU's breach of contract;

e. Reimbursement of Plaintiffs costs, legal expenses, and attorney's fees incurred in connection with this matter, together with pre-judgment interest; and

f. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demand trial by jury on all issues so triable.

#10356782v5

Dated: December 9, 2025,	Respectfully submitted,

                                                        JANE DOE

By: */s/ Thomas M. Wolf*
 Thomas M. Wolf (VSB # 18234)
Joseph M. Rainsbury (VSB #  45782)
Clarissa K. Pintado, Esq. (VSB #86882)
O'Hagan Meyer, PLLC
411 E. Franklin Street; Suite 500
Richmond, VA 23219
Telephone: (804)361-4551
Facsimile: (804) 237-0250
*Twolf@ohaganmeyer.com*
*jrainsbury@ohaganmeyer.com*
*cpintado@ohaganmeyer.com*

Alison C. Duffy, Esq. (VSB #90113)
O'Hagan Meyer, PLLC
2560 Huntington Ave, Suite 204
Alexandria, VA 22303
P: (703) 775-8606
aduffy@ohaganmeyer.com

*Counsel for Plaintiff*