IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| JANE DOE, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:25cv2299 |
| TEXAS CHRISTIAN UNIVERSITY, | ) | |
| Defendant. | ) | |

**Plaintiff's Opposition to Defendant's Motion to Dismiss,**
**or in the Alternative, to Transfer Venue**

Thomas M. Wolf (VSB No. 18234)
Joseph M. Rainsbury (VSB No. 45782)
Dale E. Wolf, II. (VBS # 101561)
O'HAGAN MEYER, PLLC
411 East Franklin Street, Suite 500
Richmond, Virginia 23219
Telephone: (804) 361-4551
Facsimile: (804) 237-0250
twolf@ohaganmeyer.com
jrainsbury@ohaganmeyer.com
dwolf@ohaganmeyer.com

Alison C. Duffy (VSB #90113)
O'HAGAN MEYER, PLLC
2560 Huntington Ave, Suite 204
Alexandria, VA 22303
Tel: (703) 775-8606
aduffy@ohaganmeyer.com

*Counsel for Plaintiff*

**CONTENTS**


**TABLE OF AUTHORITIES** ..... iii

**INTRODUCTION** ..... 1

**STATEMENT OF ALLEGED FACTS** ..... 2

**TCU's Recruitment of Jane** ..... 2

**The Falsity of TCU's Marketing Statements** ..... 3

**Jane is Raped by a TCU Student and Seeks Redress from TCU** ..... 4

**TCU Acknowledges the Inadequacy of Its Treatment of Jane's Complaint** ..... 6

**ARGUMENT** ..... 7

**I. This Court has specific personal jurisdiction over TCU because Jane's claims arise out of TCU's Virginia-directed recruiting activities.** ..... 7

A. TCU purposefully availed itself of the benefits of conducting recruiting activities in Virginia. ..... 8

B. TCU mischaracterizes the nature of Jane's claims. ..... 12

**II. The Eastern District of Virginia is a Proper Venue** ..... 14

**III. This Court should deny TCU's motion to transfer venue.** ..... 14

A. This Court should give substantial weight to Jane's decision to sue in her home forum. ..... 15

B. "Witness convenience and access" is not a compelling reason to transfer venue in this case. ..... 16

C. Transferring venue would only shift the balance of inconvenience from TCU to Jane. ..... 18

D. The interests of justice do not favor transfer. ..... 18

**IV. The Complaint states viable claims for violation of the VCPA, fraudulent inducement, and breach of contract** ..... 21

A. The Complaint states a claim under the VCPA. ..... 22

B. The Complaint states a claim for fraudulent inducement. ..... 25

C. The Complaint states a claim for breach of contract. ..... 28

**CONCLUSION** ..... 30

**TABLE OF AUTHORITIES**

**Cases**

*Acterna, L.L.C. v. Adtech, Inc.*, 129 F. Supp. 2d 936 (E.D. Va. 2001) .................................. 15, 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .................................................................................. 21

*Ballagh v. Fauber Enters.*, 773 S.E.2d 366 (Va. 2015) ........................................................... 22

*Barile v. Univ. of Va.*, 441 N.E.2d 608 (Ohio Ct. App. 1981) ................................................. 10

*Bd. of Trs. v. Sullivant Ave Props., LLC*, 508 F. Supp.2d 473 (E.D. Va. 2007) ........................ 15

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................... 21

*Bristol-Meyers Squibb Co. v. Superior Court*, 582 U.S. 255 (2017) ............................................ 8

*Byerson v. Equifax Info. Servs., LLC*, 467 F. Supp. 2d 627 (E.D. Va. 2006) ............................ 18

*Demetres v. E. W. Constr., Inc.*, 776 F.3d 271 (4th Cir. 2015) ................................................... 19

*Dowless v. Warren-Rupp Houdailles, Inc.*, 800 F.2d 1305 (4th Cir. 1986) .................................. 7

*Empire Fire & Marine Ins. Co. v. Pandt-Brown*, 322 F. Supp. 3d 694 (E.D. Va. 2018) ......................................................................................................................................... 18

*Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021) .................... 8, 9

*Garcia v. ECPI Univ. LLC*, 814 F. Supp. 3d 639, 2026 U.S. Dist. LEXIS 7636 (E.D. Va. 2026). ....................................................................................................... 23, 24

*Grayson v. Anderson*, 816 F.3d 262 (4th Cir. 2016) ................................................................... 7

*Hahn v. Vermont Law School*, 698 F.2d 48 (1st Cir. 1983) ................................................... 10, 14

*Hanson v. Denckla*, 357 U.S. 235 (1958) ................................................................................... 8

*Hazelwood v. Lawyer Garage, LLC*, 904 S.E.2d 322 (Va. Ct. App. 2024) ................................ 19

*Hiss v. Friedberg*, 112 S.E.2d 871 (Va. 1960) ........................................................................... 30

*Insteel Indus. v. Costanza Contr. Co.*, 276 F. Supp. 2d 479 (E.D. Va. 2003) ............................ 19

*Intranexus, Inc. v. Siemens Med. Sols. Health Servs. Corp.*, 227 F. Supp. 2d 581 (E.D. Va. 2002) .............................................................................................................. 15

*Jones v. R.S. Jones & Assocs., Inc.*, 431 S.E.2d 33 (Va. 1993) .................................................. 19

*Jordan v. Shaw Indus.*, No. 96-2189, 1997 U.S. App. LEXIS 33589 (4th Cir. Nov. 26, 1997) ............................................................................................................................ 13

*Karim v. Grover*, 369 S.E.2d 185 (1988) .................................................................................. 27

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) ............................................................. 8

*Kennedy v. Dabbiere*, 545 F. Supp. 3d 269 (E.D. Va. 2021) ...................................................... 25

*Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941) ....................................................... 19

*Long & Foster Real Estate, Inc. v. NRT Mid-Atlantic, Inc.*, 357 F. Supp. 2d 911 (E.D. Va. 2005). .............................................................................................................. 20

*Lowy v. Daniel Def., LLC*, 167 F.4th 175 (4th Cir. 2026) ......................................................... 21

*Lyons v. Ticer Green*, 5:21-cv-00010, 2022 U.S. Dist. LEXIS 119796, at *1, n.2 (W.D. Va. 2022) ............ 19

*Mattel, Inc. v. Greiner & Hausser, GmbH*, 354 F.3d 857 (9th Cir. 2003) ............ 7

*Performance Food Grp. Co. v. Java Trading Co.*, No. 3:05CV447, 2005 U.S. Dist. LEXIS 50518 (E.D. Va. Oct. 4, 2005) ............ 29

*Perrow v. Grand Canyon Educ., Inc.*, Case No. 2:09-cv-670, 2010 U.S. Dist. LEXIS 9538 (S.D. Ohio Jan. 15, 2010) ............ 10

*Pool Scouts Franchising, LLC v. Stuart Rd. Corp.*, 2:24-cv-239, 2025 U.S. Dist. LEXIS 61422 (E.D. Va. 2025) ............ 19

*Primov v. Serco, Inc.*, 96 Va. Cir. 121 (Fairfax County 2017) ............ 29

*Quillen v. International Playtex, Inc.*, 789 F.2d 1041 (4th Cir. 1986) ............ 19

*Sea-Land Serv., Inc. v. O'Neal*, 297 S.E.2d 647 (Va. 1982) ............ 16

*Siskind v. Villa Foundation for Educ., Inc.*, 642 S.W.2d 434 (Tex. 1982) ............ 10, 11, 12, 14

*State Farm Fire & Cas. Co. v. Scott*, 372 S.E.2d 383 (Va. 1988) ............ 29

*Sykes v. Nash Distribution, Inc.*, Civil Action No. 1:21-cv-897, 2021 U.S. Dist. LEXIS 264541 (E.D. Va. Dec. 2, 2021) ............ 29

*Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292 (4th Cir. 2012) ............ 9

*Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs.*, 791 F.3d 436 (4th Cir. 2015) ............ 14, 15

*Universal Leather, LLC, v. Koro Ar., S.A.*, 773 F.3d 553 (4th Cir. 2014) ............ 7, 8

*W. Va. ex rel. Hunt v. CaremarkPCS Health, L.L.C.*, 140 F.4th 188 (4th Cir. 2025) ............ 13

*Walden v. Fiore*, 571 U.S. 277 (2014) ............ 8

*Watiti v. Walden*, No. 07-4782 (JAP), 2008 U.S. Dist. LEXIS 43217 (D.N.J. May 30, 2008) ............ 10, 14

*Wingate v. Insight Health Corp.*, 87 Va. Cir. 227 (Roanoke County 2013) ............ 16

**Statutes**

28 U.S.C. § 1391(b)(2) ............ 14

28 U.S.C. § 1404(a) ............ 14

Virginia Code § 59.1-197 ............ 22

Virginia Code § 59.1-200(14) ............ 22

Virginia Code § 59.1-200(5) ............ 22

Virginia Code § 59.1-204(A) ............ 22

Virginia Code § 59.1-206 ............ 22

**Rules**

Fed. R. Civ. P. 12(b)(6) .......... 28
Fed. R. Civ. P. 9(b) .......... 21, 26

**Regulations**

34 C.F.R. § 106.45(b)(7)(iii) .......... 6

**INTRODUCTION**

Trapped in a web of its own falsehoods—misrepresentations made in Virginia and to Virginians—Defendant Texas Christian University ("TCU") tries to change the subject. It tries to convert Plaintiff's consumer-protection lawsuit, for which TCU has no valid defense, into a Title IX claim. TCU engages in this sleight of pen both (1) to avoid talking about the wrongs the Complaint actually alleges, and (2) to drag this case—a case that concerns the severe harm that TCU caused to a Virginia teenager in Virginia in violation of Virginia law—back to a forum that TCU prefers.

This Court should deny TCU's motion. The Complaint alleges, plainly and directly, that TCU made misrepresentations to Plaintiff Jane Doe and her parents. *This occurred in Virginia*, through materials that TCU sent to Jane's Virginia high school and to Jane herself. In so doing, TCU purposefully availed itself of the opportunity of marketing to Virginia consumers. It thereby submitted itself to the jurisdiction of Virginia courts and to the requirements of Virginia law, including the Virginia Consumer Protection Act ("VCPA").

TCU also attempts to downplay its misrepresentations, characterizing them as mere "generalized marketing materials." Not so. The statements included TCU's own published Code of Conduct and representations related to federal law. These materials painted a picture of campus life that misrepresented the extent of on-campus sexual assault and TCU's efforts to combat it. They portrayed a safe, secure, and harassment-free campus. Those representations were knowingly false when made. Indeed, TCU's own reports show that it knew that sexual assault was rampant—with scores of incidents every semester—and that nearly all such assaults were left uninvestigated and unpunished. Finally, as detailed below, TCU engages in revisionist history regarding its grossly inadequate response to Jane's rape complaint.

Plaintiff now seeks genuine redress for those wrongs. She comes to this Court—in the state where TCU's misrepresentations were made and in the very District where she received and relied on them—seeking justice in her home forum. She asks this Court to hold TCU accountable under the law Virginia enacted to protect her. Because Plaintiff has a right to be heard *in* Virginia on her Virginia-based claims, this Court should deny TCU's motion to dismiss.

## STATEMENT OF ALLEGED FACTS

*TCU's Recruitment of Jane*

Plaintiff Jane Doe is a citizen and resident of the Commonwealth of Virginia. [ECF No. 1 ("Compl."), at ¶ 2.] TCU is a citizen of Texas, with its principal place of business in Fort Worth. (*Id.*) Every year, TCU recruits students from Virginia, sending representatives to the Commonwealth to assist in its efforts. (*Id.* ¶ 4–5.) TCU specifically recruits from Jane's high school, which has an excellent academic reputation. (*Id.*) TCU's recruitment efforts included sending promotional materials to Jane's school intended for students like Jane to review. (*Id.* ¶ 9.) Jane reviewed those promotional materials in Virginia and expressed interest in TCU. (Compl. ¶¶ 9–10.) TCU then sent additional promotional materials to Jane in Virginia—both by mail and email—and directed her to visit its website for more information. (*Id.* ¶ 10.) Jane received and reviewed the materials while in Virginia. (*Id.*) The servers TCU uses to communicate with Virginia residents are in Virginia. Affidavit of Philip Depue (**Exhibit 1 hereto**).

Jane has family members who have been sexually assaulted and discriminated against. (Compl. ¶ 11.) So, in reviewing where to go to college, she paid special attention to the issue of the safety and protection of women. (*Id.*) The materials that TCU sent Jane, however, misrepresented those aspects of the university. (*Id.* ¶ 12.) They assured Jane and other students

that TCU "works to provide a safe and supportive environment for students" and that the school's Office of Institutional Equity ("OIE") works to support TCU's goals "by ensuring all individuals have the opportunity to meaningfully engage in a learning and working environment that is free from all forms of harassment and discrimination." (*Id.* ¶ 14.) And they claimed that the university was "committed to providing a[n]…environment free from discrimination." (*Id.*) Relying on these misrepresentations, Jane applied for admission to TCU. (*Id.* ¶ 16.)

TCU accepted her application and mailed an offer of admission to Jane's residence in Virginia. (*Id.* ¶ 17.) As a further inducement for Jane to attend school there, TCU offered her a four-year scholarship of approximately $40,000. (*Id.*) Relying on TCU's representations about campus life and further induced by the scholarship offer, Jane accepted the offer of admission and chose to attend school there. (*Id.* ¶ 18.) This was a financial commitment, for Jane and her family, of hundreds of thousands of dollars for the next four years. (*Id.*)

*The Falsity of TCU's Marketing Statements*

TCU's representations about its campus life—including its statement that it "ensur[ed]" that "all individuals" would be able to "meaningfully engage in a learning and working environment that is free from all forms of harassment and discrimination"—were knowingly false and deceptive. (Compl. ¶ 19.) When TCU made the statements to Jane, it knew that rape and sexual assault were a serious and chronic problem on campus. (*Id.*) It knew that there were dozens of reported—and many more *un*reported—sexual assaults and rapes on its campus *every semester*. (*Id.* at ¶ 19, ¶¶ 60-61.) And it knew that its process for handling complaints about rape and sexual assault was a sham. (*Id.* at ¶ 19, ¶¶ 63-64)

Rather than take effective measures to combat sexual harassment and rape, TCU maintains a permissive environment that perpetuates and exacerbates the problem. TCU fails to

investigate 97% of sexual assault allegations. (*Id.* ¶ 19.) It actively discourages students from filing or pursuing complaints about sexual assault and rape. (*Id.*) And, even if rape is proven, TCU fails to impose any meaningful punishment. (*Id.*) By discouraging complaints and failing to impose meaningful punishments even when rape is proven, TCU effectively condones the sexual harassment and assault it professes to oppose. (*Id.*) TCU knew its school was neither discrimination-free nor supportive of the victims of harassment and assault. (*Id.*)

*Jane is Raped by a TCU Student and Seeks Redress from TCU*

In October 2024, a male TCU student raped Jane on the TCU campus when she was unconscious and not capable of consenting. (Compl. ¶ 26.) In a recorded conversation hours after the rape, the rapist admitted that he neither sought nor received Jane's consent to intercourse. (*Id.* ¶ 28.) Shortly thereafter, Jane filed a formal complaint with TCU's OIE and met with TCU's investigator for an in-person interview. (*Id.* ¶ 31.) TCU delayed investigating the complaint and discouraged Jane from pursuing it further. (*Id.* ¶ 33.) When more than a month had elapsed without the investigator contacting Jane or her witnesses, Jane's counsel wrote to TCU officials demanding action. (*Id.* ¶ 35.) It was only after that letter that TCU contacted Jane's witnesses. (*Id.* ¶ 36.) And even then, TCU emphasized to the witnesses that they did not need to cooperate with the investigation. (*Id.*)

TCU discouraged Jane's complaints in other ways, too. It summoned Jane for a second interview—forcing her again to relive the rape. (*Id.* ¶ 37.) Worse, by asking pointed questions about Jane's appearance, dress, and physical condition, the investigators insinuated that the rape was her fault. (*Id.*) TCU also tried to bully Jane by insisting on having a hearing at a time when her counsel was unavailable, (*Id.* ¶ 38), relenting only after Jane's counsel threatened litigation.

(*Id.*) At the hearing, Jane was forced repeatedly to relive the rape through cross-examination by five different questioners. (*Id.* ¶ 39.)

This was all in spite of the perpetrator's recorded admission that Jane had not consented to the intercourse. Given that evidence, TCU's hearing panel unanimously found that the rapist had engaged in sexual intercourse with Jane without her consent. (*Id*. ¶¶ 32, 40.) Incredibly, though, the "remedy" imposed by TCU for this rape was homework; TCU directed that the rapist: (1) write a 3–4 page paper on the importance of mutual consent, which he was to discuss privately with a TCU faculty member, and (2) rewatch the same short videos on consent he had been required to watch during orientation, six weeks before raping Jane. (*Id.* ¶ 42.) He was not required to leave school, make reparations to Jane, or even apologize. (*Id.* ¶ 41.) TCU made sure that nothing about the rapist's *adjudicated* non-consensual sexual intercourse with Jane would ever appear on any record of his time at TCU. (*Id.*)

Jane appealed this decision to TCU's Vice-Chancellor of Student Affairs, noting that the panel's lenient treatment of the rapist was grossly disproportionate to the gravity of his offense. (*Id*. ¶ 43, Ex. A.) The Vice-Chancellor denied this appeal, claiming that the remedy satisfied the "educational goals of the process" insofar as it helped the rapist learn from his "mistakes." (*Id.* ¶ 44.) Under TCU's procedures, this denial of the appeal was the last word on the matter—there was no further avenue of appeal. (*Id.* ¶ 45.) Traumatized by both the rape and TCU's callous handling of it, Jane was unable to return to TCU after her freshman year. She left the school and gave up her scholarship. (*Id.* ¶ 48.) On information and belief, the rapist also decided to transfer to another school. (*Id.* ¶ 52.)

*TCU Acknowledges the Inadequacy of Its Treatment of Jane's Complaint*

Having exhausted her appeals within TCU's procedures for handling sexual-assault claims, Jane had her counsel send the university a draft complaint in June 2025. (Compl. ¶ 48.) (*Id.* ¶ 48.) The school responded in July 2025, acknowledging that the university's decision was wrong and saying it was now suspending the rapist for two semesters. (*Id.* ¶ 49.) This, too, was a sham. Procedurally, it was ineffective; TCU's earlier denial of Jane's appeal was "the final determination in this matter." *See* 34 C.F.R. § 106.45(b)(7)(iii)[1] Moreover, on information and belief, the rapist already had transferred to another school, so the "suspension" had no effect on him. (*Id.* ¶ 52.) TCU's belated acknowledgement to Jane and its false representation of a new "remedy" were a Virginia-directed effort to persuade Jane not to pursue her claims against the school.

TCU made other efforts to forestall litigation. It proposed to Jane and her family to engage in mediation in Virginia. (*Id.* ¶ 53.) TCU agreed to have its representatives come to Alexandria, Virginia on August 11, 2025, to mediate before TCU's chosen mediator, retired United States District Judge Liam O'Grady. (*Id.*) TCU agreed to pay half the cost of the mediation. (*Id.*) Jane incurred substantial legal fees in preparing for the mediation. (*Id.* ¶ 55.) She, her counsel, and Judge O'Grady showed up for the mediation on the appointed date. (*Id.*) At the last moment, however, TCU reneged on its promise to mediate, dismissively telling Jane

[1]"The determination regarding responsibility becomes final either on the date that the recipient provides the parties with the written determination of the result of the appeal, if an appeal is filed, or if an appeal is not filed, the date on which an appeal would no longer be considered timely." *See also* ECF No. 11-1, at 12 ("If the appeal is not upheld, ***the matter shall be considered final*** and the decision of the appellate officer, PCB, or formal Conduct Panel will be binding upon all involved.") (quoting § 5.11.4 of TCU's Code of Student Conduct 2023-24) (emphasis added).

that "these claims are really not worth much in court" and "this case will never stay in Virginia." (*Id.* ¶ 56.) This action followed.

## ARGUMENT

### I. This Court has specific personal jurisdiction over TCU because Jane's claims arise out of TCU's Virginia-directed recruiting activities.[2]

When challenged by a defendant, a plaintiff must make a prima facie showing to support its claim of personal jurisdiction. *Universal Leather, LLC, v. Koro Ar., S.A.*, 773 F.3d 553, 559 (4th Cir. 2014). A plaintiff establishes a prima facie case of jurisdiction by presenting facts that, if true, would support jurisdiction over the defendant. *Id.* at 561 (citing *Mattel, Inc. v. Greiner & Hausser, GmbH*, 354 F.3d 857, 862 (9th Cir. 2003)). At the pleading stage, however, a plaintiff need not offer evidence; allegations are sufficient. *Dowless v. Warren-Rupp Houdailles, Inc.*, 800 F.2d 1305, 1307 (4th Cir. 1986) ("Dowless need not present evidence in making a prima facie case to oppose a motion to dismiss. Mere allegations are sufficient."). In reviewing the pleadings and briefs, the court must view the allegations and evidence in the light most favorable to the plaintiff—i.e., in favor of finding personal jurisdiction. *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016). *See also Universal Leather*, 773 F.3d at 560 ("Because the district court did not conduct an evidentiary hearing, the court was required to assume the credibility of Universal's version of the facts, and to construe any conflicting facts in the parties' affidavits and declarations in the light most favorable to Universal.").

---

[2] Plaintiff does not contend that TCU is subject to general jurisdiction. Accordingly, this brief will not respond to TCU's arguments on the issue. Instead, it will focus on explaining why TCU's recruiting efforts in Virginia subject it to *specific* personal jurisdiction

A. TCU purposefully availed itself of the benefits of conducting recruiting activities in Virginia.

TCU's efforts to market its educational services in Virginia give this Court personal jurisdiction over the university. To establish specific personal jurisdiction, a plaintiff must show the defendant took "some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum state." *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351, 359 (2021) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Such contacts "must be the defendant's own choice and not 'random, isolated, or fortuitous.'" *Id.* (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770. 774 (1984)). For instance, a defendant may "'reach[] out beyond'" its home by "exploiting a market in the forum State or entering a contractual relationship centered there." *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)). While the plaintiff's claims "'must arise out of or relate to the defendant's contacts' within the forum," *id.* (quoting *Bristol-Meyers Squibb Co. v. Superior Court*, 582 U.S. 255, 262 (2017)), there need not be a strict causal relationship linking the plaintiff's claims with the defendant's forum-related activity. *Ford Motor Co.*, 592 U.S. at 362. But there still must be some "affiliation" between the two. *Id.* (quoting *Bristol-Meyers*, 582 U.S. at 262).

TCU purposefully availed itself of the benefits of conducting activities in Virginia when it elected to conduct marketing activities directed to Virginia residents. "The purposeful availment inquiry is grounded on the traditional due process concept of 'minimum contacts,' which itself is based on the premise that 'a corporation that enjoys the privilege of conducting business within a state bears the reciprocal obligation of answering to legal proceedings there.'" *Universal Leather*, 773 F.3d at 559 (quoting *Tire Eng'g*, 682 F.3d at 301). An out-of-state defendant purposefully avails itself of the benefits of conducting activities in the forum state

when, as here, (1) it "substantially collaborate[s] with a forum resident" and (2) that collaboration "constitute[s] an integral element of the dispute." *Id.* at 560 (quoting *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 302 (4th Cir. 2012)). Successfully marketing products or services in the forum state is a classic example of purposeful availment. *Ford Motor Co.*, 592 U.S. at 363 (a company purposefully avails itself of the benefits of acting within the forum when it deliberately extends its marketing efforts into the forum state).

The Complaint asserts facts establishing substantial collaboration between TCU and residents of the Commonwealth, including Jane. It alleges that "TCU recruits heavily in Virginia" and "sends representatives to Virginia every year to assist in this recruiting." (Compl. ¶ 4.) It alleges that "TCU specifically recruits students from [Jane's high school] every year." (*Id.* ¶ 6.) It alleges that TCU "sent Jane's high school promotional materials," which "Jane reviewed." (*Id.* ¶ 9.) It alleges that TCU specifically recruited Jane to attend the university, sending promotional materials directly to her by mail and email. (Id. ¶ 10.) And it alleges the creation of an ongoing contractual relationship with Jane and her family. In addition to offering Jane admission to its four-year undergraduate program, TCU offered her a four-year scholarship totaling approximately $40,000. (*Id.* ¶ 17.) TCU and Jane thereby entered into a substantial, long-term, educational and financial collaboration with each other. Having enjoyed the privilege of marketing to Virginia residents and entering into significant long-term relationships with them, TCU has the reciprocal obligation of answering in Virginia courts for disputes arising out of those contacts.

TCU asserts, however, that the plaintiff's claims must "arise out of" the defendant's forum contacts—i.e., be the causal consequence of those contacts. But the Supreme Court rejected this approach in *Ford Motor Co. v. Montana Eighth Judicial District*, highlighting the

"or relate to" language in its earlier formulations of the minimum contacts standard for specific personal jurisdiction.[3] 592 U.S. at 362 ("We have never framed the specific jurisdiction inquiry as always requiring causation—i.e., proof that the plaintiff's claim came about ***because of*** the defendant's in-state contact") (emphasis added). For purposes of the present case, however, the issue is academic, because Jane's claims both arise out of *and* relate to TCU's Virginia-related contacts. Not only did TCU's successful recruiting efforts in Virginia relate to Jane's acceptance of TCU's offer of admission, they were the but-for cause of Jane's being the victim of its permissive approach toward on-campus sexual-assault.

Other courts, addressing this same issue, hold that exercising jurisdiction over an out-of-state school is constitutionally permissible when the claim relates to the out-of-state school's forum-directed marketing activities.[4] The decision of the Texas Supreme Court in *Siskind* is

---

[3] TCU's brief relies on the Fourth's Circuit's formulation of the specific jurisdiction test in *Crabtree v. Aon Ins. Managers Bermuda Ltd.*, No. 23-1959, 2025 U.S. App. LEXIS 7230, at *3 (4th Cir. Mar. 28, 2025). In addition to misquoting the passage—omitting the phrase "directed at the State"—TCU also omits an earlier portion of the case specifying that the litigation must result "'from alleged injuries that arise out of ***or relate to*** those activities.'" (*Id*. at *3) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)) (emphasis added).

[4] *See, e.g., Hahn v. Vermont Law School*, 698 F.2d 48 (1st Cir. 1983) (finding specific personal jurisdiction over a Vermont law school that recruited heavily in Massachusetts and sent application materials to the plaintiff at his request); *Watiti v. Walden*, No. 07-4782 (JAP), 2008 U.S. Dist. LEXIS 43217 (D.N.J. May 30, 2008) ("By specifically targeting New Jersey citizens and then knowingly entering into an ongoing business relationship with a New Jersey resident, Walden availed itself of the protections and benefits of New Jersey law such that it should expect to submit to litigation in this forum"); *Davis v. Baylor University*, 976 S.W.2d 5 (Mo. Ct. App. 1998) (noting that persistent solicitation was sufficient to ground specific personal jurisdiction over fraud claims even where the contact was only by phone and mail); *Barile v. Univ. of Va.*, 441 N.E.2d 608, 616 (Ohio Ct. App. 1981) ("[A]ppellee subjected itself to the jurisdiction of the Ohio courts, when it purposely entered this state and recruited the appellant to play football for the University of Virginia"); *Perrow v. Grand Canyon Educ., Inc.*, Case No. 2:09-cv-670, 2010 U.S. Dist. LEXIS 9538 (S.D. Ohio Jan. 15, 2010) (holding that Ohio court had specific in personam jurisdiction over fraudulent inducement claim against online school headquartered in Arizona); *Siskind v. Villa Foundation for Educ., Inc.*, 642 S.W.2d 434 (Tex. 1982) (holding that

*(note continued on following page . . . )*

instructive. It shows that if the shoe were on the other foot—i.e., if a *Texas* student brought a fraudulent inducement claim in *Texas* against a *Virginia* college—a Texas court would not hesitate to find personal jurisdiction over the Virginia school. *Siskind* involved an Arizona school for students with "motivational problems." The school advertised in national publications circulated in Texas. It also placed advertisements in Texas telephone directories. But it engaged in no in-person marketing in Texas. The plaintiff, a Texas resident, sued in Texas when the school expelled his son but refused to refund his tuition. He asserted claims for misrepresentation and violation of the Texas Deceptive Trade Practices Act. The Texas Supreme Court found that the school's advertising efforts established a purposeful act in Texas:

> Considering Villa's advertising in conjunction with its practice of mailing informational packets, applications for admission, invitations to re-enroll, and enrollment contracts to Texas residents, it is apparent that Villa is affirmatively seeking business in Texas. Villa's solicitation of Texas business, consisting of representations made in Texas, is a purposeful act committed in Texas.

642 S.W.2d at 436. It also found that there was a connection between the plaintiff's claims and the school's Texas-directed activity:

> [T]here is a connection between Siskind's claim for breach of contract and Villa's contacts with Texas. Siskind alleged that Villa's representations made to him in Texas induced him to enter a contract which was partially executed in Texas.

642 S.W.2d at 437. Finally, it found that exercising personal jurisdiction over the out-of-state school would not offend constitutional principles:

> Subjecting Villa to the jurisdiction of the Texas courts does not offend traditional notions of fair play and substantial justice. Having actively and successfully solicited business in Texas, it is

---

out-of-state school's advertisements in Texas were sufficient to ground specific personal jurisdiction).

> not unreasonable to require Villa to defend a suit based on its contacts with Texas.

642 S.W.2d at 437. The Texas Supreme Court's reasoning applies with equal force in the present case. Having successfully recruited Jane in Virginia, it is not constitutionally unreasonable to require TCU to defend a suit in Virginia arising out of that recruiting.

B. TCU mischaracterizes the nature of Jane's claims.

TCU's brief fails to cite the *Siskind* decision. Nor does it cite any other cases—many listed above—in which courts have found *specific* personal jurisdiction over out-of-state educational institutions. Instead, TCU relies on cases where courts refuse to find *general* personal jurisdiction over out-of-state schools.[5] These cases are straw men. Jane does not contend that this Court has *general* personal jurisdiction over TCU. But TCU still must answer for its actions in a Virginia court where, as here, it has purposefully availed itself of the benefits of soliciting long-term educational and financial relationships with Virginia residents.

TCU, however, protests that the present case does not arise out of its Virginia contacts, claiming that "[t]he gravamen of the case remains a Texas campus incident and TCU's Texas-based response to it." [ECF No. 11 ("Br."), at 7.] Continuing, it asserts that "[n]one of TCU's limited contacts with the Commonwealth bear a causal or even tangential relationship to the alleged wrongs." (*Id.* at 9.) Not so. To begin with, TCU mischaracterizes the nature of the present action, analyzing the jurisdiction issue *as if* Plaintiff had brought a Title IX case. But

---

[5] Defendant also relies on *Teleqo Tech Sols., Inc. v. Archtop Fiber LLC*, No. 1:24-cv -01515, 2024 U.S. Dist. LEXIS 207340 (E.D. Va. Nov. 13, 2024). This case is inapposite. It was a commercial case involving a New York company that requested mobile-mapping services from a Virginia company related to projects in New York and Massachusetts. This Court held that it lacked personal jurisdiction. Unlike the present case, *Teleqo* did not involve sustained marketing efforts in Virginia leading to a long-term educational arrangement with a Virginia citizen and her family.

Jane, not TCU, is "the master of the complaint." *W. Va. ex rel. Hunt v. CaremarkPCS Health, L.L.C.*, 140 F.4th 188, 195 (4th Cir. 2025) (the "plaintiff is the master of the complaint."). And Jane elected *not* to proceed under a Title IX theory. Instead, the "gravamen" of the present case is consumer fraud. (Compl. at ¶¶ 67-73; 75-78.) By marketing itself to Jane and other *Virginia* residents, TCU painted a false picture of itself as an institution that was safe and supportive for women. (*Id.*) Jane and her family relied on those *Virginia*-directed communications *in Virginia* when she accepted TCU's *Virginia*-directed scholarship award and offer of admission. The fraud was complete, and damages began to accrue, at that time. *See Jordan v. Shaw Indus.*, No. 96-2189, 1997 U.S. App. LEXIS 33589 (4th Cir. Nov. 26, 1997) ( "The 'last act' necessary for a fraud claim is the reasonable reliance on the false representation which causes the injury."). As a matter of law, therefore, the locus of the primary wrongdoing was Virginia. To be sure, Jane *discovered* TCU's misrepresentations only after the "Texas campus incident" (i.e., the rape) and TCU's callous and inadequate "Texas-based response" to it. But those events simply unmasked the misrepresentations in TCU's *earlier* communications—directed to Jane and other Virginia residents—about TCU's purported dedication to a safe and discrimination-free environment. It was those *Virginia* contacts that led Jane and her family to enter into a long-term financial relationship with TCU.

Finally, TCU claims that there is no specific personal jurisdiction because it sent Jane marketing materials only after she expressed interest in TCU. (Br. at 9.) But this ignores the Complaint's allegations that TCU specifically targeted Virginia in general, and Jane's high school in particular, before Jane ever responded. (Compl. ¶¶ 4–6, 9.) Courts consistently find personal jurisdiction where a school directed marketing at forum residents, regardless of the

temporal sequence of communications. *Siskind*, 642 S.W.2d at 437; *Hahn*, 698 F.2d at 52; *Watiti*, 2008 U.S. Dist. LEXIS 43217, at *27.

## II. The Eastern District of Virginia is a Proper Venue.

Under 28 U.S.C. § 1391(b)(2), a case may be brought in a "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." As explained above, Counts I & II sound in fraud. The Complaint asserts that TCU made false representations, targeted at District residents, about the quality of the services it would provide. TCU offered Jane, a resident of this District, admission and a scholarship. Jane relied on TCU's representations, made in this District, when deciding to accept TCU's scholarship and offer of admission. This led Jane to suffer long-term financial and emotional injury in this District. Thus, TCU's Virginia-directed misrepresentations and Jane's reliance on them comprise a "substantial part of the events or omissions giving rise to" Counts I and II. As for Count IV, the omission giving rise to Jane's contract claim is TCU's failure to appear at the parties' scheduled mediation before Judge O'Grady, which was to occur in this District. Thus, a substantial part of the events or omissions giving rise to each of Jane's claims occurred in this District.

## III. This Court should deny TCU's motion to transfer venue.

As a fallback argument, TCU asks that this Court transfer venue to the Northern District of Texas pursuant to 28 U.S.C. § 1404(a). "District courts within this circuit consider four factors when deciding whether to transfer venue: (1) the weight accorded to plaintiff's choice of venue; (2) witness convenience and access; (3) convenience of the parties; and (4) the interest of justice." *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs.*, 791 F.3d 436, 444 (4th Cir. 2015). None of these factors supports transfer of venue in the present case.

### A. This Court should give substantial weight to Jane's decision to sue in her home forum.

The first factor weighs heavily in Jane's favor as she has filed the present action in her home forum. "As a general rule, a plaintiff's 'choice of venue is entitled to substantial weight in determining whether transfer is appropriate.'" *Trs. of the Nat'l Plumbers and Pipefitters Fund,* 791 F.3d at 444 (quoting *Bd. of Trs. v. Sullivant Ave Props., LLC*, 508 F. Supp.2d 473, 477 (E.D. Va. 2007)). *See also Acterna, L.L.C. v. Adtech, Inc.*, 129 F. Supp. 2d 936, 938 (E.D. Va. 2001) ("Generally, a plaintiff's choice of forum is entitled to substantial weight."). This factor receives additional weight where the plaintiff sues in her home forum. *Acterna*, 129 F. Supp. 2d at 938 ("[A] plaintiff'[s] choice of its home forum is given more weight than its choice of a foreign forum."); *Intranexus, Inc. v. Siemens Med. Sols. Health Servs. Corp.*, 227 F. Supp. 2d 581, 583 (E.D. Va. 2002) ("Plaintiff has brought suit in its home forum, which strongly favors retaining venue in this Court"). Thus, the first factor counsels strongly against transfer of venue.

TCU argues that this Court should give "little weight" to Jane's choice of forum because, TCU claims, "the Eastern District of Virginia has no connection to the underlying facts of Jane's claims." (Br. at 15.) But TCU's saying this does not make it so. As explained above, in Section II, the "underlying facts of Jane's claims" include (1) TCU's misrepresentations targeted at residents in this District, (2) Jane's reliance, in this District, upon TCU's targeted misrepresentations, and (3) TCU's failure to appear at an agreed-upon mediation in this District. Because a substantial part of Jane's claims arose in this, her home District, the first factor "strongly favors retaining venue in this Court." *Intranexus*, 227 F. Supp. 2d at 583.

B. "Witness convenience and access" is not a compelling reason to transfer venue in this case.

The second factor—witness convenience and access—is, at best, a wash. To support her allegations about TCU's marketing efforts in Virginia and the lasting injury caused to her, Jane will need to rely on witnesses in Virginia. These include friends and family members in Virginia, who will testify about her reliance on TCU's misrepresentations and the severe emotional distress she suffered because of that misplaced reliance.[6] They include her parents, who were involved in Jane's decision to attend TCU, who helped pay for her to attend, and who were involved in her post-rape health care and in preparation for the aborted mediation. They also include Virginia health care providers, who will testify to the severity of Jane's emotional distress. And they include Judge O'Grady, who would testify about TCU's repudiation of the agreement to mediate.

TCU's brief ignores *Jane's* witnesses. It complains that "the parties cannot subpoena Texas-based witnesses to appear *in person* at trial." (Br. at 15.) But this is no hardship for TCU, as it can secure the in-person attendance of its own employees at trial in Virginia. The same would not be true for Jane's witnesses, whom she does not employ, if the case were transferred to Texas. Moreover, TCU fails to explain why taking *de bene esse* depositions of persons residing outside the reach of this Court's subpoena power would be a hardship. *Acterna*, 129 F.

[6] As noted infra, Jane is withdrawing her *claim* for intentional infliction of emotional distress. But she is not abandoning her demand for emotional-distress *damages*. Such damages are recoverable under Jane's VCPA claim, which remains. *See Wingate v. Insight Health Corp.*, 87 Va. Cir. 227, 237 (Roanoke County 2013) (holding that noneconomic damages are recoverable under the VCPA). They are also available for her fraud claim. *Sea-Land Serv., Inc. v. O'Neal*, 297 S.E.2d 647, 653 (Va. 1982) (holding that "recovery of damages for humiliation, embarrassment, and similar harm to feelings" was appropriate for intentional torts "although unaccompanied by actual physical injury.").

Supp. 2d at 939 (noting party "has not sufficiently explained why *de bene esse* depositions of nonparty witnesses outside the subpoena power would be inadequate during a *Markman* hearing or the trial and why Jane would need their live testimony"). Recorded testimony of unavailable witnesses is commonplace in modern trials. *Id.*

TCU also complains that requiring its employees to attend trial in Virginia would "unnecessarily pull TCU personnel away from their educational duties in Fort Worth" for a longer time than if they were to appear for trial in Texas. (Br. at 15.) Given the abundance of flights between Fort Worth and Northern Virginia, this is unlikely to add significantly to TCU's employees' time away from their work.[7] Their burden would be little different from the inconvenience faced by any witness who must testify at trial. Lastly, TCU states that "all documents and discovery materials are maintained on TCU's campus." (Id.) Given the modern digitization of documents and discovery materials, this is a non-issue. And to the extent the physical location of the documents in Texas presents an inconvenience, this inconvenience will be borne by Jane, not TCU. So, TCU should not be heard to complain about it.

In short, each of TCU's arguments about its witnesses and documents could be inverted and applied, with equal or greater force, to *Jane's* witnesses and documents. If the matter is transferred to the Northern District of Texas, then Jane's Virginia-based witnesses will not be subject to subpoena, might not be able to attend trial, and—if they do attend trial—would lose additional time from work. Accordingly, "witness convenience and access" is not a compelling reason for transferring venue.

---

[7] TCU's stated willingness to fly out to Virginia for a mediation illustrates that the burden of traveling to this forum is not onerous.

C. Transferring venue would only shift the balance of inconvenience from TCU to Jane.

This Court should give zero weight to the third factor, i.e., the convenience of the parties. TCU asks the Court to transfer this case from Jane's home district to TCU's home district. "Thus, transfer would, at most, 'only shift the balance of inconvenience from defendant[s] to plaintiffs' and therefore 'does not militate persuasively in favor of transfer." *Byerson v. Equifax Info. Servs., LLC*, 467 F. Supp. 2d 627, 633 (E.D. Va. 2006) (citation omitted).

D. The interests of justice do not favor transfer.

With respect to the last factor—the interests of justice—TCU contends that "the Northern District of Texas is better positioned to evaluate the actions of Texas-based officials, interpret the application of Texas law, and oversee discovery that will involve confidential educational records." These arguments are baseless. This Court, and a Virginia jury, can evaluate the conduct of Texans just as well as a Texas court and jury can. As for discovery, this Court routinely oversees complex discovery involving confidential materials. It is certainly capable of dealing with whatever confidentiality or privilege issues may arise.

The case also should remain in the Eastern District because of this Court's greater familiarity with Virginia law. TCU asserts that Texas law will apply. But a proper choice-of-law analysis shows that *Virginia* law will apply to the claims asserted in the Complaint. In diversity cases, a district court must apply the choice-of-law rules of the jurisdiction in which it sits.[8] *Empire Fire & Marine Ins. Co. v. Pandt-Brown*, 322 F. Supp. 3d 694, 697 (E.D. Va. 2018)

---

[8] An exception to this rule is where a case has been transferred from another jurisdiction. In such a circumstance, courts apply the choice of law rules of the transferor state, not the transferee state. *See Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). Thus, Virginia choice-of-law rules—and Virginia law—will apply regardless of whether this case is transferred.

(citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)). For tort claims, Virginia applies the rule of *lex loci delicti*—the law of the place of the wrong. *Demetres v. E. W. Constr., Inc.*, 776 F.3d 271, 273 (4th Cir. 2015) ("Virginia subscribes to the *lex loci delicti* principle for determining the applicable substantive law in tort suits.") (citing *Jones v. R.S. Jones & Assocs., Inc.*, 431 S.E.2d 33 (Va. 1993)). A wrong occurs at "the place where 'the last event necessary to make an act liable for an alleged tort takes place.'" *Quillen v. International Playtex, Inc.*, 789 F.2d 1041 (4th Cir. 1986) (citation omitted). *See also Hazelwood v. Lawyer Garage, LLC*, 904 S.E.2d 322, 328 (Va. Ct. App. 2024) (approving *Quillen's* "last event" approach). Thus, for tort claims, the choice of law analysis boils down to identifying where the "last event necessary to make an act liable" occurred.

For fraud claims, such as those asserted in Counts I and II, ***the "last event" necessary to create liability is the plaintiff's reliance upon the defendant's misrepresentations***. *Insteel Indus. v. Costanza Contr. Co.*, 276 F. Supp. 2d 479, 486 (E.D. Va. 2003) (holding that "the last act necessary for a fraud claim is the reasonable reliance on the false representation that caused the injury" and finding that this occurred where the plaintiffs received the defendant's misrepresentations); *Lyons v. Ticer Green*, 5:21-cv-00010, 2022 U.S. Dist. LEXIS 119796, at *1, n.2 (W.D. Va. 2022) (noting that, under Virginia choice-of-law rules, "'[t]he 'last act' necessary for a fraud claim is the reasonable reliance on the false representation which causes the [alleged] injury'"); *Pool Scouts Franchising, LLC v. Stuart Rd. Corp.*, 2:24-cv-239, 2025 U.S. Dist. LEXIS 61422, at *36 (E.D. Va. 2025) (same). Thus, for choice of law purposes, the fraud alleged in Counts I and II occurred in the jurisdiction where Jane received and relied on TCU's misrepresentations. Jane relied on TCU's misrepresentations in *Virginia*, when she accepted TCU's scholarship and admission offer. Accordingly, Virginia law governs Counts I and II.

Count IV, for breach of contract, concerns TCU's last minute repudiation of the agreement to mediate.[9] Under Virginia's choice of law principles, disputes over contract performance are governed by the law of the place where the contract is to be performed. *Long & Foster Real Estate, Inc. v. NRT Mid-Atlantic, Inc.*, 357 F. Supp. 2d 911, 915 n.5 (E.D. Va. 2005). The mediation was to have occurred in Virginia, so the law of this Commonwealth will apply to that claim, too.

Thus, all of Jane's claims will be governed by Virginia law. Because of this Court's greater familiarity with Virginia law, the interests of justice would be best served by keeping the case here rather than sending it to the Northern District of Texas. This is especially so for Count I, under the VCPA. The General Assembly enacted this statute to protect Virginians against the kinds of misrepresentations that Jane alleges here. Virginia has a special interest in having VCPA claims adjudicated here.

A final interest-of-justice factor is the effect on Jane of forcing her to return to Fort Worth to litigate this case. Jane now resides in Virginia because she was too traumatized to return to TCU. If the case is transferred to the Northern District of Texas, she would have to attend trial in Fort Worth. Returning to Fort Worth, the site of the rape, is likely to reopen wounds and exacerbate psychological injuries she already has suffered. It is in the interests of justice, and common decency, not to require her to do so.

---

[9] As noted *infra*, Section IV, Jane has withdrawn Count III, her claim for intentional infliction of emotional distress.

## IV. The Complaint states viable claims for violation of the VCPA, fraudulent inducement, and breach of contract.[10]

TCU also has moved to dismiss under Rule 12(b)(6) for failure to state a claim. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In conducting this analysis, the court is bound to accept all factual allegations in the complaint as true. *Id*. While "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *id.,* "plaintiffs are not required 'to prove [their] case in the complaint.'" *Lowy v. Daniel Def., LLC*, 167 F.4th 175, 193 (4th Cir. 2026). A court's evaluation of a complaint's *plausibility* does not mean belief in its *merits*: "[I]t is error for a district judge to give 'a serious claim the back of its hand' because it does not believe the plaintiff's allegations." *Id.* Assessing a claim is instead a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Finally, Counts I and II assert claims sounding in fraud. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*

[10] Plaintiff hereby withdraws Count III, for intentional infliction of emotional distress and so will not address TCU's arguments directed towards that claim.

A. The Complaint states a claim under the VCPA.

The allegations in the Complaint state a claim under the VCPA. The VCPA affords a cause of action to consumers injured by deceptive actions of suppliers of goods and services.[11] Va. Code § 59.1-204(A). The statute enumerates a set of "fraudulent acts or practices committed by a supplier in connection with a consumer transaction."[12] Code § 59.1-200. These include "[m]isrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits" (§ 59.1-200(5)), and "[u]sing any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction" (§ 59.1-200(14)). The VCPA is a remedial statute whose aim is "to promote fair and ethical standards of dealings between suppliers and the consuming public." Code § 59.1-197. Remedial statutes are construed "liberally, in favor of the injured party." *Ballagh v. Fauber Enters.*, 773 S.E.2d 366, 368 (Va. 2015). And the VCPA's protection against deceptive marketing practices "extends considerably beyond" conduct that the common law treats as fraud. *Owens v. DRS Auto Fantomworks, Inc.*, 28 Va. 489, 497 (2013).

The facts asserted in the Complaint establish a claim under the VCPA. The Complaint alleges that TCU misrepresented in Virginia the nature of its goods and services by stating that it "works to provide a safe and supportive environment for students" and that it was "committed to

[11] The VCPA also authorizes Virginia's Attorney General to prosecute VCPA civil enforcement actions. See Code § 59.1-206.

[12] TCU does not deny that Jane's entering into an agreement with TCU was a "consumer transaction." But it argues, wrongly, that this consumer transaction occurred in Texas. (Br. at 17) ("Here, the alleged consumer transaction took place in Texas"). It bases this allegation on the assertion that "Jane moved to Texas to pay for and receive a service from TCU." (*Id.*) But TCU offers no support for this assertion. Nor can it. Jane and her parents entered into the consumer transaction by accepting TCU's offer of admission and scholarship. This occurred in Virginia, months before Jane arrived at the TCU campus to commence her schooling.

providing a[n] environment free from discrimination." (Compl. ¶¶ 14, 19.) And the Complaint alleges that Jane relied on these statements, suffering injury as a result. *(Id.* ¶¶ 18, 73). In addition to identifying the misrepresentations, the Complaint asserts a litany of facts explaining why the statements were false, deceptive, and fraudulent when made. (*Id*. ¶¶ 19). Among other things, it alleges that "[r]ape and other sexual assault were rampant on the TCU campus," with "dozens of reported, and many more unreported, sexual assaults/rapes on its campus every semester." (*Id.*) It alleges that TCU considers rape to be a "mistake" for which homework is an appropriate "remedy." (*Id.*) It alleges that, by design, TCU fails to investigate 97% of sexual assault allegations." (*Id.*) And it alleges that TCU "actively discourages students from filing or pursuing complaints about sexual assault/rape." (*Id.*) Given those factual allegations—which this Court must accept as true in this posture—the Complaint states, with particularity, a claim under the VCPA. *See Garcia v. ECPI Univ. LLC*, 814 F. Supp. 3d 639, 2026 U.S. Dist. LEXIS 7636 (E.D. Va. 2026).

*Garcia*, decided earlier this year, is directly on point. That case involved ECPI, a for-profit educational institution offering an associate degree in nursing. 2026 U.S. Dist. LEXIS 7636, at *1.[13] Just like TCU, ECPI advertised itself as being "committed to providing a teaching, learning, and working environment that is free from sexual harassment and sexual misconduct." *Id.* at *2. Relying on those representations, the plaintiff enrolled in the nursing program. *Id.* at *20. At the time ECPI made its representations about sexual harassment and misconduct, it was aware that one of its instructors regularly harassed female students. *Id.* After enrolling, the plaintiff was sexually harassed by that instructor. *2-*3. When the school took no action on her

[13] Although *ECPI* has an F. Supp. 3d citation, the online version lacks F. Supp. 3d page references, so the pinpoint citations will be to the LEXIS version.

complaints, she sued ECPI under the VCPA. Under those alleged facts, this Court held that the plaintiff "sufficiently alleges the who, what, when, where, and how required to satisfy Rule 9(b)'s heightened pleading standard." And it found that the Complaint was "sufficient to state a claim under the VCPA." *Id.* at *20.

The allegedly false statement in *Garcia v. ECPI*—i.e., that the school was "committed to providing a teaching, learning, and working environment that is free from sexual harassment and sexual misconduct"—is nearly identical to the statements identified in ¶¶ 14 and 19 of the present Complaint. And, as in *Garcia*, the Complaint in the present case recites facts showing that, at the time TCU made the statements, it knew that they were false. (Compl. ¶¶ 19, 60-64.) In its brief, however, TCU attempts to distinguish *Garcia* by claiming that "TCU followed through on what it promotes publicly." (Br. at 20.) But TCU's characterization of the facts is not entitled to any weight at this stage of the proceedings. Viewing the Complaint in the light most favorable to Jane, TCU's callous response to Jane's complaints was—if anything—worse than the non-action in *Garcia*. Despite having a recorded confession from the rapist, TCU did not lift a finger for over a month. (Compl. ¶ 34.) It undertook an investigation only after Jane's counsel sent a letter to the designated investigator. (*Id.* ¶ 35.) The investigator emphasized to the witnesses that they need not cooperate. (*Id.* ¶ 36.) When interviewing Jane a second time, they humiliated her by suggesting that the rape was her fault. (*Id.* ¶ 37.) And even after concluding that the rapist had not obtained Jane's consent for intercourse, the only "remedy" was to have the rapist write a 3-4 page paper on the importance of mutual consent and rewatch a short video he had already been required to watch. (*Id.* ¶ 41-42.) These allegations support Jane's assertion that TCU's complaint procedures are a sham that, in practice, foster the opposite of an

environment "free from all forms of harassment and discrimination." They put the lie to TCU's assurances of a "safe and supportive" environment for women.

B. The Complaint states a claim for fraudulent inducement.

For similar reasons, the Complaint states a claim for fraudulent inducement. "To prevail on a claim of fraud in the inducement under Virginia law, a party must prove by clear and convincing evidence a (1) false representation of material fact; (2) made intentionally, in the case of actual fraud, or negligently or innocently, in the case of constructive fraud; (3) reliance and detriment; and (4) inducement to enter the contract." *Kennedy v. Dabbiere*, 545 F. Supp. 3d 269, 291 (E.D. Va. 2021).

The Complaint alleges facts establishing each of these elements, and it alleges circumstances constituting fraud with the particularity that Rule 9(b) requires. Paragraphs 14 and 19 of the Complaint identify the specific misrepresentations forming the basis for the fraud claim, i.e., that TCU "works to provide a ***safe and supportive environment*** for students," that the OIE advance's the school's aims "by ***ensuring*** all individuals have the opportunity to meaningfully engage in a learning and working environment that is ***free from all forms of harassment and discrimination***," and that it was "committed to providing a[n] ***environment free from discrimination***." (Compl. ¶¶ 14, 19) (emphasis added).[14] Paragraphs 19 and 60-64 allege, with granularity, that TCU knew the statements were false when made. Paragraph 15 alleges that TCU made the statements to induce prospective students to attend the school.[15] And

[14] TCU complains that the Complaint does not attach copies of these statements or provide evidence of where they originated. But the matter is before the Court on a Rule 12(b)(6) motion, not summary judgment. In any event, TCU's brief shows that it was aware of these statements.

[15] TCU argues that it cannot be held liable because the content of the statements was not specifically directed to Jane. (Br. at 24) ("There is nothing in TCU's alleged statements…which

*(note continued on following page . . . )*

Paragraph 18 alleges detrimental reliance on these misrepresentations, stating that "[i]t was ***as a direct result of the false representations*** made to her in Virginia, enhanced by the scholarship offer, ***that Jane chose to attend TCU*** and her parents committed to spending hundreds of thousands of dollars to send her there." (Emphasis added.)

In its brief, however, TCU argues that "Jane fails to allege with particularity that TCU either knew the representations were false or made such representations reckless [sic] as a positive assertion without knowledge of its truth." (Br. at 23.) This argument fails for two reasons. First, Rule 9(b) does not require a plaintiff to allege state of mind with particularity. *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally"). Second, even if scienter needed to be alleged with particularity—and it does not—the allegations meet this standard. The Complaint explains how and why TCU knew that its representations about a safe and discrimination-free environment were false. (Compl. ¶¶ 19, 60–64.) It alleges that TCU knew that rape and sexual assault were a serious and ongoing problem. (*Id.*) And it alleges that TCU knew that its procedures for handling complaints were not adequate to protect women from on-campus sexual harassment. (*Id.*) These allegations state a plausible claim for relief.

---

would lead TCU to know there was an especial likelihood that they would reach Jane and influence her specific conduct.") But TCU does not—and cannot—deny that these statements were part of its general efforts to attract students to attend the university. The Complaint specifically alleges, in paragraph 13, that "TCU intended for prospective students in Virginia and their parents to rely on these representations, and Jane did reasonably rely on them." In this respect, they are no different from the advertisements in *Siskind* and the web statements in *Garcia*, which were found to be actionable as fraud. TCU also ignores the Complaint's allegations that TCU specifically targeted Jane's high school for its marketing efforts and specifically directed Jane to the website containing the false statements.

TCU also tries to distance itself from the alleged misrepresentations by characterizing them as "non-factual opinion statements." (Br. at 24.) But the statements mirror those in *Garcia*, which this Court found sufficient to state a consumer-fraud case under the VCPA. *Garcia*, 2026 U.S. Dist. LEXIS 7636, at *19-*20 ("Garcia alleges that the policy represented that ECPI 'was committed to providing a teaching, learning, and working environment that is free from sexual misconduct…implying compliance with Title IX and a safe educational environment'"). Nor are they mere "puffery" or sales talk. Many applicants, including Jane, evaluate colleges with "particular attention to the issue of safety and protections for women." (Compl. ¶ 11.) Whether TCU provides a safe, discrimination-free, and supportive environment for its female students (60% of the student body, *id*. ¶ 14) is a question of fact, provably true or false. In the statements at issue, TCU assures such applicants that the educational environment is "free from all forms of harassment and discrimination," all the while being aware of its chronic problems of sexual assault, exacerbated by its policy of treating rape as a "mistake." (*Id*. ¶¶ 14, 18.) TCU's statements are a gross misstatement of the facts, but they are not opinion.

Finally, TCU contends that the Complaint does not adequately allege that her reliance on TCU's representations caused her injury. This argument is a non-starter. "Ordinarily, the issue of proximate cause is a question of fact for resolution by a jury." *Karim v. Grover*, 369 S.E.2d 185, 186 (1988). In the present case, Jane has alleged causation with sufficient particularity to give TCU notice of the nature of her claim. The Complaint alleges that Jane accepted TCU's offer "***as a direct result of the false representations made to her*** in Virginia, enhanced by the scholarship offer." (Compl. ¶ 18) (emphasis added). Jane and her family would not have spent upwards of $100,000 but for those representations. And Jane would not have been subjected to the rape—and TCU's non-response to it—but for that reliance. Her emotional harm was a

foreseeable consequence of her having been misled by TCU in Virginia about the safety of women on its campus.

TCU, however, contends that Jane's injuries *really* were the result of the rape, not TCU's misrepresentations or its botched handling of her OIE complaint. (Br. at 25.) But this ignores Jane's financial injuries. And it also ignores that Jane exposed herself to TCU's unsafe and unsupportive environment as a direct result of TCU's misrepresentations. Her reliance on TCU's assurances about a harassment-free campus is what led her to be at TCU in the first place. Finally, teasing apart the etiology of Jane's severe emotional distress is a fact-bound inquiry that is not amenable to resolution in a Rule 12(b)(6) motion.

C. The Complaint states a claim for breach of contract.

Finally, the Complaint asserts a contract claim arising out of TCU's failure to appear, as promised, at the August 11, 2025 mediation with Judge O'Grady. "The elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ramos v. Wells Fargo Bank, NA*, 770 S.E.2d 491, 493 (Va. 2015) (quoting *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)).

The complaint alleges each of these elements. It alleges the existence of an agreement to mediate in person before Judge O'Grady in Alexandria. (Compl. ¶ 90.) It alleges that TCU violated that agreement by failing to appear, as promised, at the August 11, 2025 mediation. (*Id.* ¶ 53.) And it alleges that Plaintiff suffered damages, in the form of wasted attorney's fees, as a result of TCU's failure to appear as promised. (*Id.* ¶ 55.) Virginia policy favors the private mediation of disputes and will enforce mandatory-mediation agreements. *Primov v. Serco, Inc.*,

96 Va. Cir. 121, 128 (Fairfax County 2017) ("Virginia courts have enforced mandatory mediation provisions").

TCU responds by claiming that its promise to appear for mediation was illusory, a mere "agreement to agree." (Br. at 29.) But this misconstrues the nature of the consideration provided by the parties. The consideration, offered by both sides, was the reciprocal promise to show up at the appointed place and time. Contrary to TCU's suggestion, neither side promised to *settle* the dispute. Instead, the parties just committed to *meet and confer* at a specific time and place in Virginia in front of Judge O'Grady. Enforcing such an agreement is no different from enforcing a contractual mandatory-mediation provision. If TCU were right—and such agreements were worthless agreements to agree—then courts would never enforce mandatory mediation provisions. But courts, including this Court, ***do*** enforce such provisions. *Sykes v. Nash Distribution, Inc.*, Civil Action No. 1:21-cv-897, 2021 U.S. Dist. LEXIS 264541, at *6 (E.D. Va. Dec. 2, 2021) (staying case and ordering the parties to mandatory mediation); *Performance Food Grp. Co. v. Java Trading Co.*, No. 3:05CV447, 2005 U.S. Dist. LEXIS 50518, at *1 (E.D. Va. Oct. 4, 2005) (dismissing case and ordering mediation and arbitration); *Primov*, 96 Va. Cir. at 128 (same).

TCU also claims that Jane cannot recover the attorney's fees she spent in preparation for the mediation, citing the "American Rule." But there is an exception to the American Rule where a party's breach of contract has forced them to incur legal expenses that they otherwise would not have incurred. Such expenses are properly viewed as recoverable contract damages. *State Farm Fire & Cas. Co. v. Scott*, 372 S.E.2d 383, 386 (Va. 1988) ("We have recognized an exception to the general rule in actions for breach of contract where the breach compels a plaintiff to maintain or defend a suit with a third party" (citing *Hiss v. Friedberg*, 112 S.E.2d

871, 875-76 (Va. 1960)). In the present case, TCU's broken promise to appear at the August 11, 2025 mediation caused Jane to incur expenses that were rendered worthless in light of TCU's failure to show up. Because those expenses flowed directly from the breach, Jane may recover her attorney's fees as contract damages.

## CONCLUSION

For all the foregoing reasons, Plaintiff Jane Doe respectfully requests that this Court DENY Defendant TCU's Motion to Dismiss or in the Alternative to Transfer Venue.

Respectfully Submitted,

JANE DOE

/s/ *Thomas M. Wolf*
Of Counsel

Thomas M. Wolf (VSB No. 18234)
Joseph M. Rainsbury (VSB No. 45782)
Dale E. Wolf, II. (VBS # 101561)
O'HAGAN MEYER, PLLC
411 East Franklin Street, Suite 500
Richmond, Virginia 23219
Telephone: (804) 361-4551
Facsimile: (804) 237-0250
twolf@ohaganmeyer.com
jrainsbury@ohaganmeyer.com
dwolf@ohaganmeyer.com

Alison C. Duffy (VSB #90113)
O'HAGAN MEYER, PLLC
2560 Huntington Ave, Suite 204
Alexandria, VA 22303
Tel: (703) 775-8606
aduffy@ohaganmeyer.com

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of May 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send notification of such filing to all counsel of record:

Jason R. Waters, Esq.
Lauren E. Gilman, Esq.
Nicole K. Rocha, Esq.
WILSON ELSER MOSKOWITZ
EDLEMAN & DICKER, LLP
8444 Westpark Drive, Suite 510
McLean, VA 22102-5102
Tel: (703) 245-9300
Fax: (703) 245-9301
Jason.Waters@wilsonelser.com
Lauren.Gilman@wilsonelser.com
Nicole.Rocha@wilsonelser.com

*Counsel for Defendant*

*/s/Thomas M. Wolf*
Thomas M. Wolf, Esq.